UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION


```
UNITED STATES OF AMERICA      )
                              )
          V.                  )   5:16-CR-075-BO-1
                              )
ERIC JAVON THOMPSON,          )
                              )
          DEFENDANT.          )
_____)
```


SENTENCING HEARING
MAY 30, 2017
BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE



<u>APPEARANCES</u>:

<u>For the United States</u>:

Ms. Erin C. Blondel
United States Attorney's Office
310 New Bern Avenue, Suite 800
Raleigh, NC 27601


<u>For the Defendant</u>:

Ms. Rosemary Godwin
434 Fayetteville Street, Suite 2050
Raleigh, NC 27601




OFFICIAL COURT REPORTER:  Michelle Maar, RDR, RMR, FCRR
Stenotype with computer-aided transcription

<pre>
1              TUESDAY, MAY 30, 2017, 3:00 P.M.

2              THE COURT:  Eric Thompson.

3              MS. BLONDEL:  Good afternoon, Your Honor.

4              THE COURT:  Good afternoon.

5              MS. GODWIN:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7          (Brief pause in the proceedings)

8              MS. BLONDEL:  Your Honor, while we're waiting for

9    Mr. Thompson, I just wanted to update the Court -- we filed

10   a notice that we expected a victim to be present today.

11   That victim decided not to come in person today.

12      So I do have some victim impact statements to present

13   to the Court on behalf of the victims here.  But there are

14   no victims here.

15             THE COURT:  There are no live victims to

16   allocute?

17             MS. BLONDEL:  That's correct, Your Honor.

18             THE COURT:  But you have material that you'll

19   present?

20             MS. BLONDEL:  Yes, Your Honor.  Briefly.

21             THE COURT:  All right.

22         (Brief pause in the proceedings)

23             THE COURT:  You're Eric Thompson?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Do you want to say anything about
</pre>

1   your sentence today?

2          THE DEFENDANT:  I have a couple things that I

3   wanted to say, Your Honor.

4       First thing, I don't want to waste your time or waste

5   the Court's time going back and forth with the prosecutors

6   to try to make excuses and justifications for my actions

7   because I was wrong for doing what I was doing.  I

8   shouldn't have been doing it.  And I just want to say that

9   my family wanted to be here and support me -- my

10  grandfather who raised me, my parents, and my sisters.  But

11  I'm too ashamed and too embarrassed to have them sit in

12  here and listen to the details of my case.  And I have too

13  much respect for my family to even put them in this

14  situation and to embarrass them even more than I already

15  have.  So I didn't even tell them that my hearing was

16  today.  And I know that they will be disappointed.  But I

17  couldn't bear to see the hurt on their face from hearing

18  everything in my case -- whether it's true or false.  I

19  just couldn't put them through this.  And the truth is,

20  Your Honor, I couldn't have been raised by anybody better

21  than my family or shown more love by anybody better than my

22  family.  And I'm just disappointed in myself that my

23  actions didn't reflect that.  And embarrassing my family

24  the way I did is something I have to live with for the rest

25  of my life.  And the one lesson that I learned is my

actions can hurt my family way more than it hurts me.  And
that's something that I wasn't thinking about.  You know,
I'm just disappointed in myself for missing out on so much
of my son's life for my mistakes.  Those are precious years
that I won't be able to get back.  And it breaks my heart
that I had to tell my son that I was in jail.  And every
time I talked to him, he just asked me daddy, when are you
going to be home so I can see you again?  And I couldn't
even tell my son that I wouldn't be able to see him again.
That's what hurts the most because I'm hurting my son from
being in this situation.  But this experience has taught me
how important it is for me to be present in my son's life
and set a positive example so he don't have to go through
the things that I'm going through one day and teach him
valuable lessons about life, take him to prosperity and
keep him from going down the road of destruction,
especially with all the negative influences today.  And,
Your Honor, this lifestyle, it's something that I was
introduced to when I was living in California.  Even though
I was working when I was out there, it's a way of life out
there.  That doesn't make it right.  But I was never
introduced to nothing like this before I moved out there.
And I saw the ups and downs to it.  And I looked at it as a
quick way to come up.  So when I came back to North
Carolina, I didn't have a job.  And I was trying to make

fast money.  And I tried it.  And it backfired.  And it

just taught me that fast money was a fast downfall.  So I

learned from my mistake.  I grew from it.  And just being

in this situation is a lifetime perspective and it has just

taught me that how precious every moment being with my son

and my family is and that no one knows how precious freedom

and time is like someone who has been locked up for a long

period of time.  These are the things that I had to learn

through this experience.  And I'm not someone who gets in

trouble over and over.  This is my first time having my

freedom taken away.  And I've never been in a situation

like this before.  And I feel like God put me in this

position to get my attention because I was living wrong and

maybe this is the only way he could get my attention.

Sometimes he puts you in a position like this to make you

elevate and want to be a better person.  And that's what

this situation has done for me is opened my eyes and was a

reality check and that one wrong turn down the wrong road

can cost you your life or a large portion of your life.

And I never knew that, I never thought that I would end up

in this position.  And it never even crossed my mind.  But

I just want to turn this negative into a positive and try

to tell younger people that's going down the wrong path and

teaching them from my experience and what I've been

through.  Because if somebody would have told me that's

going through what I'm going through today when I started

doing what I was doing, then I never would have did it at

all.  And this right here is the scariest day of my life,

period, to have my hands, my life and my freedom and my

future in somebody else's hands that will determine when I

get to see my son and my family again is a scary feeling

that I never want to experience again.  And I just want to

say I'll never gamble with my freedom again for the sake of

money and being taken away from my family and my son and

everyone and everything I love.  Because there's nothing

worse than going through this situation.  And I just ask

for leniency in my sentencing.  This is my first time

taking my freedom away.  Everybody makes mistakes.  And

this is mine.  I've learned, I've grown from it.  And no

one can say that I haven't learned my lessons because I

haven't had a chance to prove that I have.  And I just ask

for a second chance to rebound from my situation and make

my family proud and be a father to my son.

          That's all I got to say, Your Honor.

               THE COURT:  What did you do?

               THE DEFENDANT:  I was a pimp.

               THE COURT:  Yes.  And tell me about it.

               THE DEFENDANT:  As I said, I was introduced to

this lifestyle when I was in California.

               THE COURT:  What do you mean you were introduced

1  to this lifestyle when you were in California?  I don't

2  know what that means.

3           THE DEFENDANT:  Well, my cousin, he was doing

4  this.  And my cousin was dead broke one day --

5           THE COURT:  He what?

6           THE DEFENDANT:  I said my cousin, he was doing

7  this.  So I was introduced to it from him.  I was working

8  the whole time out there with my cousin.  He was dead

9  broke.

10           THE COURT:  They were broke?

11           THE DEFENDANT:  Yes, sir.  He was broke.

12           MS. GODWIN:  Dead broke.

13           THE COURT:  Dead broke.

14           MS. GODWIN:  Dead broke.

15           THE DEFENDANT:  One of my friends gave him a

16  prostitute to work.  And in two weeks, he had two working

17  for him.  He was walking around with thousands of dollars.

18  And then I met another girl, she was --

19           THE COURT:  What did he have to do in order to

20  get the thousand dollars?

21           THE DEFENDANT:  Well, he was just --

22           THE COURT:  Beat people up?

23           THE DEFENDANT:  No, sir.  He would just send them

24  out there to walk and do, and get clients.  And they would

25  just bring him back the money.  That's why I looked at it

1　as a quick come up.  But it wasn't.  It was a quick way to
2　miss out on a big portion of my life.
3　　　　　　　THE COURT:  Is your cousin still doing that?
4　　　　　　　THE DEFENDANT:  No, sir.
5　　　　　　　THE COURT:  What happened to him?  Is he alive or
6　dead?
7　　　　　　　THE DEFENDANT:  He's alive.  But he got screwed
8　over by a girl that he was working.  They went out of town.
9　And when they went out of town, he was sleeping, they took
10　all his clothes, all his money, and left him there with
11　nothing.  And I had to give him a train ticket back home.
12　　　I've seen the ups and downs of this business.  But me
13　just being exposed to it, I felt I could do it better than
14　how I saw other people doing it.  And I was wrong.
15　　　　　　　THE COURT:  Where were you doing this?
16　　　　　　　THE DEFENDANT:  North Carolina and South
17　Carolina.
18　　　　　　　THE COURT:  Where were you going in South
19　Carolina?
20　　　　　　　THE DEFENDANT:  Charleston.
21　　　　　　　THE COURT:  How did you figure that out?
22　　　　　　　THE DEFENDANT:  Well, my son, he stays 30 minutes
23　away from Charleston.  So I decided one day to go in and
24　see how it was.  And it was all right up there.  So I just
25　started doing it there.  Whenever I could see my son, I

would leave from here, spend time with my son, and get back
to it.

        THE COURT:  Uh-huh.  Okay.  Thank you.

    You want to provide the allocution, the victim
participation?

        MS. BLONDEL:  Certainly, Your Honor.

    I'm going to start with the victim identified as S.R.
in the PSR.  She said she would like to say that the
defendant made her life hell.  She was afraid to leave her
house.  She spent money on a security system because she
thought he had someone watching her, following her around.
She said that she was scared to death that someone would
hurt her.  She's finally at the point where she can go and
do what she wants to do.  But she was terrified.

    The victim H.U., identified as H.U., said that she has
replayed the memories in her head and it causes her great
pain.

    The victim, J.H. says that she has forgiven the
defendant.  This was scary for her but it has ultimately
made her a bigger and stronger person.  She doesn't know why
the defendant did this to her or to these other victims just
to make money.  She says it's not her right to judge the
defendant but she forgives him and prays for him.

    Finally, the victim N.D. says that this incident has
caused her to change her opinion about life.  She doesn't

1    trust anyone.  And it's hard to have friendships and

2    relationships.  She struggles financially.  She's lost jobs.

3    And she's had to start her life over.  She wants her life to

4    go back to how it was before she met the defendant.

5        Those are the victims' statements, Your Honor.

6            THE COURT:  Okay.  The presentence report is

7    offense level 36, criminal history category 1.  The

8    guideline range would be 188 to 235.  But the statutory

9    maximums don't exceed 180 months.  And so that's the

10   guideline.

11           MS. GODWIN:  We had filed objections, Your Honor.

12   But Mr. Thompson has authorized me to advise the Court that

13   he does not intend to pursue those objections and accepts

14   the guideline range as calculated by United States

15   Probation and the statutory cap.

16           THE COURT:  All right.  Do you want to say

17   anything about his sentence?

18           MS. GODWIN:  I do.  Your Honor, I provided

19   character letters through a sentencing memo.  Exhibit A was

20   from his, the mother of his son, Jaden.  And the rest of

21   the letters were from friends and family.

22       And just as Mr. Thompson has told the Court, the

23   letters confirm that when he was arrested, he did not want

24   his family or friends visiting with him in jail.

25       All the letters tell you that he was raised by good

people, just like he said, in a church environment, singing in the choir, and playing sports in high school. And he's kept a steady job ever since he was in high school, steady, lawful, legitimate job working in security companies, managed to keep, for the most part, out of trouble. And then he went out to California. And this did happen when he came back. He's 29. And he's not minimizing his behavior in any way. This was an eight-month window of his life that he was involved in this business. But if you take that eight-month window away and look at the rest of his teenage and adult life, by all accounts, he conducted himself in a respectful, law-abiding, proper manner. And he intends to do that again.

There were -- obviously, you've seen the offense conduct that's described by the women involved in this.

And I will tell the Court there's does not appear to be any direct evidence that I can find -- and I think the government will agree -- that he ever went to somebody's home and forcibly kidnapped them or any of those sorts of behaviors. The things that flared up between them tended to flare up after they had answered ads and were in the hotel rooms with him. And then, at times, different ones came and went and left and new ones would come.

The other thing he wanted me to make the Court aware of is there's some other things in the presentence report that

1   are not flattering, related to items that were found in his

2   jail cell after he was arrested on the state court charges.

3   And he says, you know, that was over two years ago.  And he

4   was in the jail rapping, he was in there hanging out with

5   other guys.  Somebody had this book.  He's not making

6   excuses for the content of those writings.  But like he

7   said, he's had over two years to sit in the jail and think

8   about what, how he's treated these women and, as a result of

9   that, how he's treated himself as well and has shifted his

10  focus to a personal transformation and has sought out books

11  and writings and readings for more business and spiritual,

12  personal development and does, indeed, want to return home

13  after his time at the Bureau of Prisons on what I think we

14  would consider maybe the straight and narrow, like the good

15  spiritual upbringing that he did have.

16      He's very close to his mother and other family members.

17  And he -- she calls.  She wanted to be here.  She's going to

18  be very upset, I'm sure, that he didn't allow her to come.

19      But he understands the objectification of women that

20  this crime involved.  He's had a lot of time to think about

21  that.  And he wants to serve his time and, as he says, deal

22  with his shame and use it as an opportunity to transform

23  away from that dark side and continue back, step back into

24  the life he was living before he went to California.

25      He has been very close to his son.  And that seems to

1    be an appropriate way for him to show -- who wrote a nice

2    letter explaining that to the Court.

3        He would ask that the Court consider a recommendation

4    for a Butner or a Bennettsville placement so that he could

5    maintain his support system that he has with his family and

6    consider child support in lieu of a fine.

7        He knows he's going to prison.  He understands that 180

8    months is lower than the guideline range.  I'm asking the

9    Court to consider some variance, not a tremendous variance,

10   but something that would recognize the fact that until this

11   eight or nine-month window, everything about his life he had

12   done appropriately.  And he's got -- we do know that people

13   who have been lawfully employed in the past have a lower

14   risk of recidivism.  People that have expressed remorse and

15   accepted responsibility in a candid way for their behavior

16   and not denying or minimizing it have a better opportunity

17   and track for rehabilitation.  And I would ask the Court to

18   consider some variance to recognize the strength that he did

19   develop before he went down the wrong road and to also take

20   into consideration his acceptance of responsibility and

21   acknowledgment of just how incredibly wrong his behavior has

22   been.

23            THE COURT:  Okay.  What does the government say?

24            MS. BLONDEL:  Your Honor, I just want to, as you

25   can see, his PSR is substantial.  But I want to summarize

1    in very broad terms what this defendant's MO was.

2         What he would do is he would put out ads to people --

3    and I saw copies of the ads, we have numerous copies of them

4    -- make 5,000 dollars modeling.  And they were very cagey

5    about what you were actually doing.  They certainly never

6    said prostitution.  Sometimes they would say escorting but

7    it was a little unclear.  And he would sort of do these

8    pitches to women and make it sound like they were going to

9    go to California and make it big and be famous.  And they'd

10   come and they'd meet him.  And that night, usually that

11   night or shortly thereafter, he would insist that they

12   perform oral sex on him while he filmed it.  He would put

13   them to work almost immediately prostituting.  He would then

14   post those videos online for profit without these women's

15   consent and often without their knowledge.

16        As they prostituted for him, he would take all the

17   money they earned.  This was a cold, calculated gamble at

18   money -- just like he said himself.  He would keep all the

19   money that they earned.  They were stuck staying with him in

20   hotels and moving between hotels.  Many of them reported

21   that they couldn't go out and feed themselves or get basic

22   necessities without his permission or an escort.  They were

23   afraid of him, Your Honor.  They felt like they were working

24   non-stop in prostitution -- which is, that's a very hard way

25   to live your life.  It means you're working all hours day

1   and night.  And when they would cross him, he would

2   sometimes get violent.  We have a victim, N.D., who he

3   pressed up, he'd say I'm going to press you up.  He grabbed

4   her by her neck, lifted her clear off the ground until she

5   nearly passed out.  And others were aware this was

6   happening.  It frightened her.  It frightened them.  He took

7   another victim, K.V., grabbed her by the throat, flung her

8   across a hotel bed, Your Honor.  There are other women not

9   named in the indictment who he was also physically violent

10  with -- not all the time but enough to create an atmosphere

11  of fear.  And that's what human trafficking is all about,

12  Your Honor.

13      And the writings that Ms. Godwin referred to, I think

14  he probably did copy these, frankly, from a book.  This is

15  what was in his personal notebook, Your Honor.  This is

16  Paragraph 20 of the PSR on Page 7:

17      Choose the right victim.  The right victims are those

18  for whom you can fill a void.  They're often isolated and

19  unhappy.  And you can bring out the best or excitement in

20  them.  If you create an illusion that through you they come

21  about their dreams, you'll have them at your mercy.  Isolate

22  the victim.  An isolated person is weak.  By isolating your

23  victim, you make them more vulnerable to your influence.

24  Take them away from their norm, friends, family, home, where

25  they will have no outside support.  In their confusion, they

1    can be easily led.

2        Your Honor, that's human trafficking 101.  That's how

3    you take people who are vulnerable to you and you exploit

4    them for profit.  That is what he did to these women in this

5    case.  That is why we're asking the Court to impose the

6    guideline sentence -- which is the statutory maximum of 180

7    months.

8              THE COURT:  Who were the men?  Who were the

9    uninterpreted line of customers that came in?  What do

10   these people look like?  Who are they?

11       Is it the same person a hundred times in a row?  Or is

12   it a hundred persons one time in a row?  I mean, what do

13   they look like?  Are they all, you know, 1950s traveling

14   salesmen?  I doubt it.

15             MS. BLONDEL:  Well, Your Honor, no.  I think it

16   is a combination of regulars and people, and people

17   coming --

18             THE COURT:  What do they look like?  Who are

19   they?  Are you young, old, black, white, Hispanic?  Are

20   they tall, short, fat, skinny?  Who are they?

21             MS. BLONDEL:  Well, Your Honor, I would say that

22   they are often -- it runs the gamut.  Typically they're

23   younger.  They're often middle class.  Many of them are

24   married.  You see -- in total candor, Your Honor, a lot of

25   this offense conduct took place in Jacksonville, North

1    Carolina near the base.  You do see, this is,

2    unfortunately, a big problem in the military areas.

3         And what happens is with the dawn of the internet,

4    these women were advertised online.  And anybody knows they

5    can go on backpage.com in their area and see a woman that

6    looks appealing to them.  And they can place that phone call

7    and get a date.  That's how this was going on predominately,

8    Your Honor.

9             THE COURT:  This is one person a day?  Five

10   people a day?  Ten people a day?

11            MS. BLONDEL:  It depends.

12            THE COURT:  Days off?  I mean, seven days a week,

13   31 days a month?  I don't -- I have no idea.

14            MS. BLONDEL:  It is seven days a week work, Your

15   Honor.  And depending on -- a good day would be seven to

16   ten men per woman.  It could exceed that.  Could be less on

17   a slow day.  But we're talking high numbers here.

18            THE COURT:  And what kind of money is involved?

19            MS. BLONDEL:  Depending on the length of the

20   visit, Your Honor, we're talking anywhere from 60 dollars

21   to --

22            THE COURT:  How much?

23            MS. BLONDEL:  60 dollars on the low end for a

24   short visit, quick visit, versus 120, 300 dollars for two

25   women specials.  It really depends on the length of time

1  and the number of women involved and sometimes also the

2  conduct.  You pay more for certain types of activities.

3            THE COURT:  And he regulated all of that?

4            MS. BLONDEL:  Yes.  Yes, Your Honor.  Some of our

5  victims were saying that they were making 600 to 1000 a day

6  sometimes.  And you'll see, the parties have stipulated to

7  restitution in one victim's case based on the numbers of

8  men and the amount involved.  And that stipulation is I

9  believe 19,200 dollars of money that she earned that she

10 did not receive.  That's the kind of money we're talking

11 about.  It's significant, Your Honor.

12           THE COURT:  Well, you can't earn money committing

13 felonies.

14           MS. BLONDEL:  Correct.  Correct.  That's why he's

15 here today.

16           THE COURT:  Yes.

17           MS. GODWIN:  The only thing I would add, Your

18 Honor -- and it's not in any way minimizing -- but the

19 statements from grand jury testimony and witness interviews

20 are that many of these women were dropped off at their

21 homes, considered time away, a vacation, would come back.

22 There were all kinds of dysfunctional dynamics as one might

23 anticipate.  He bought train tickets for one lady when she

24 wanted to go home, drove her back to her home when she

25 wanted to leave.  Some of these women were homeless and

1   were dependent on him in that way.  Some had been

2   prostituting prior to answering the ad or connected with

3   him in a hotel.  So you just had a whole mixture of

4   individuals and different reasons and different ways they

5   came into his world.  And they had similar experiences

6   where they were clearly afraid and talked very candidly

7   about that.  And some left very quickly after they got

8   there.  It wasn't that he was pursuing them and brought

9   them back.  That's the only point he wanted to make.

10          THE COURT:  All right.

11          MS. GODWIN:  But it is, you know, what it is.

12          THE COURT:  All right.  Under 3553(a), I think

13   that the guideline, which is the statutory punishment and

14   is less than the anticipated guideline, is fair, just, and

15   reasonable in this case.

16       And so on Count 3, I'll impose a sentence of 10 years,

17   and on Count 7, 5 years consecutive -- so a combined

18   sentence of 180 months.  Supervised release of life on

19   Count 3 and three years on Count 7.

20       He's not to violate any federal, state, or local law,

21   use or associate with any controlled substance or dangerous

22   weapon.  Pay restitution in the amount of 19,200 dollars.

23   And a special assessment of 200 dollars.

24          MS. GODWIN:  Thank you, Your Honor.

25          THE COURT:  I'll recommend him to Butner and

1  recommend him to receive credit for the time served.

2          MS. GODWIN:  Thank you, Your Honor.

3          THE COURT:  Okay.

4          MS. GODWIN:  Would you consider a recommendation

5  for the drug treatment program?

6          THE COURT:  I'll recommend him for drug

7  treatment.

8          MS. GODWIN:  Thank you.

9      (Proceedings concluded at 3:31 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE

3

4          This is to certify that the foregoing transcript

5    of proceedings, taken at the criminal session of the United

6    States District Court, is a true and accurate transcription

7    of the proceedings taken by me in machine shorthand and

8    transcribed to the best of my ability by computer under my

9    supervision.

10       This, the 21st day of July, 2017.

11

12                      /S/   MICHELLE MAAR

13                      Michelle Maar, RDR, RMR, FCRR
                        Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25